Casimiro V. Otero v. Commissioner.
Otero v. Commissioner
Docket No. 30235.
United States Tax Court
1953 Tax Ct. Memo LEXIS 273; 12 T.C.M. (CCH) 467; T.C.M. (RIA) 53145; April 29, 1953
Irving B. Loonin, Esq., for the petitioner. Joseph F. Lawless, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The respondent determined deficiencies in income tax and made 50 per cent additions for fraud, as follows: Year
Deficiency
50% Addition
1941
$ 840.67
$ 420.33
1942
888.72
444.36
1943
634.33
317.16
1944
1,139.69
569.84
1945
2,137.57
1,068.78
The petitioner contests both the deficiencies and additions for fraud and pleads the limitation of section 275 (a) of the Internal Revenue Code as a bar to the deficiencies for the years 1941, 1942, 1943, and 1944. Findings of Fact The petitioner is an individual residing in Brooklyn, New York. *274 He filed his returns for the years in question with the collector for the first district of New York. The petitioner was born in Spain in 1905. When he was six or seven he started school and attended for three years. After that he worked as a fisher boy. In 1920 he came to the United States. He lived with an uncle who later became his father-in-law. He worked successively as scowman on a dredge, a ship cleaner, and a foundryman until 1924 when he entered the Merchant Marine where he was employed as a seaman. In 1933 the petitioner became a citizen of the United States. In 1934 the petitioner married, moved into a small apartment, and shortly thereafter his two brothers-in-law and his father-in-law came to live with him. From about 1935 until the time of this trial the family has lived in a six-room apartment in a four-family house which originally rented for $20 per month. At the time of the trial the rental was $47 per month. The petitioner and his wife have lived modestly and have never owned an automobile, jewelry, furs, or life insurance. At the time of his marriage the petitioner had about $7,000 in savings. In 1934 he went to work as a stationary fireman and handyman *275 with O. B. Potter Properties, Inc. and has been so employed ever since. He has been engaged in no other business. His wages were $1,636.66 in 1941; $2,022.58 in 1942; $1,793.02 in 1943; $2,080.97 in 1944; and $2,690.54 in 1945. These amounts plus $302.79 received in 1943 from Park Drug Co. were the only amounts reported as income for those years by the petitioner. In 1937 the petitioner's father, who was also living in this country, died leaving the petitioner in possession of $12,000 cash which the father had turned over to him for safekeeping a few months earlier. No administration of the estate was ever had. The petitioner deposited an undisclosed amount of this money in his bank accounts. The petitioner's mother-in-law had died in 1935 and from her the petitioner and his wife obtained about $2,000. During the years 1941 to 1945, inclusive, the petitioner had six bank accounts in his name with various banks, and during the same period he purchased United States Treasury Bonds, Series E, at a purchase price of $5,662.50 Interest was credited on his bank accounts in each year in varying amounts which he did not report on his returns. In 1940 the petitioner loaned $4,000 to John *276 Pontes. Pontes repaid the loan in varying amounts beginning in 1940 and ending in 1945. The petitioner also made a loan of $1,300 in 1940 to Peter Garcia Formoso which was repaid over a period of a year and a half. Part of the amounts repaid was deposited in the petitioner's bank accounts and part was used to purchase the Series E bonds. Between 1941 and 1945, Juan Diaz Perez left the sum of $5,000 with the petitioner for safekeeping. Perez was a seaman frequently absent from the country on his voyages. John Castro, also a seaman, similarly left $2,000 with the petitioner between 1941 and 1945. The petitioner also received the following sums for safekeeping: $2,500 from Richard Varela, a brother-in-law, between 1938 and 1945; $7,000 from Benedict Varela, another brother-in-law, between 1935 and 1945; and at the beginning of 1945 he held $15,000 belonging to Leo Trevino. These sums were deposited in the petitioner's bank accounts. The petitioner kept no books, gave no receipts, and except in the case of Foremoso, took no notes and made no records of the above transactions. The matters were handled on a basis of mutual trust. In 1948 an internal revenue agent began an investigation *277 of the case of Manuel Perez. One of the transactions questioned was a real estate deal in which the petitioner was used as a "dummy". The agent interrogated the petitioner and as a result the petitioner readily disclosed his bank accounts and Series E bonds. The agent became interested in the increase shown by the bank deposits and bond purchases. The petitioner explained he had an inheritance from his father and that the amounts in question also represented loans and sums held for seamen. The explanation given was not satisfactory to the agent and he prepared a net worth statement showing increases in net worth in the following amounts: 1941
$6,514.14
1942
5,179.70
1943
2,647.54
1944
4,838.63
1945
7,711.00
On the basis of this statement the respondent determined the deficiencies here in question. No part of the deficiency in any of the years in controversy is due to fraud with intent to evade tax. Opinion The principal issue is whether the petitioner filed false and fraudulent income tax returns for the years in question with intent to evade tax, and the burden is on the respondent to prove fraud by clear and convincing evidence. We know it is often *278 difficult to meet this burden and that fraud may be gleaned from all of the facts and the normal and reasonable inferences therefrom. The respondent based his deficiency determinations on "unexplained net worth increases" which he treated as the receipt of unreported taxable income. These net worth increases were computed from increases in bank deposits and certain bond purchases disclosed by the petitioner during the investigation of another taxpayer with whom the petitioner had dealings. At the time of this investigation the petitioner was interrogated by an internal revenue agent and explained that the increases in his bank deposits and the bond purchases resulted from the repayment of loans, from monies left with him by seamen and his brothers-in-law, and from money received from his deceased father. His explanation did not satisfy the agent. At the trial the petitioner departed in no material detail from the explanation given the agent and called witnesses who substantiated the explanation. The petitioner himself was a witness. Pontes and Perez with whom he had some of the claimed transactions were witnesses and they confirmed the petitioner's story. Richard and Benedict *279 Varela, the petitioner's brothers-in-law, also testified and while we were less impressed with them as witnesses because of some improbabilities in their testimony, yet we cannot discredit them entirely. Their testimony corroborated that of the petitioner. The deposition of Formoso, one of the persons to whom the petitioner claimed he made a loan which was repaid during the period under consideration, was presented. Formoso's deposition confirmed the petitioner's explanation. These witnesses were all of Spanish extraction. Several were seamen who were absent from the country from time to time on voyages. One testified through an interpreter. On the whole, despite certain inconsistencies, they were credible. The revenue agent also testified, but we are unable to glean from his testimony any affirmative evidence of fraudulent intent on the part of the petitioner. After considering the evidence as a whole, the demeanor of the witnesses, and all other facts of record, we conclude that the respondent has not established that the petitioner filed income tax returns for the years in question which were false and fraudulent with intent to evade tax. Admittedly the petitioner did not report *280 as income the interest which was credited on his bank deposits, but, considering his lack of education, his limited business experience, and meager knowledge of English, we think this was due to mistake or oversight and not to fraudulent intent. Our holding on the fraud question disposes of the deficiencies for 1941, 1942, 1943, and 1944, for those years are barred by the statute of limitations. This leaves the year 1945 for consideration. For that year the petitioner signed a consent extending the period of limitation upon assessment. Accordingly, the statute of limitations does not act as a bar. We have found no fraud for 1945 and we accept the petitioner's explanation of the source of funds which led to increased bank accounts and furnished the wherewithal for bond purchases. If there is any deficiency for 1945 it is because the petitioner had interest credited to his bank deposits in that year which should have been reported in addition to the wages, which he did report. The bank accounts are in evidence, but we have been unable to make an accurate computation of the amount of 1945 interest credits from them. Rather than set the matter down for rehearing on this point we assume *281 the parties will be able to agree on the amount of accrued interest for 1945 which can then be used in a Rule 50 computation for determining the correct deficiency for that year. Decision will be entered under Rule 50.